Williams, J.
The record discloses that at the time of the execution of the written instrument on which the action below was founded, the maker, Glidden, had in store with the Union Storage Company, at Newcastle, Pennsylvania, 972 tons of pig *597 iron, for which, he held the company’s nine storage warrants mentioned in the instrument. Each warrant bound the company to deliver the iron represented by it to the order of Glidden at the place of storage, upon payment of the -charges and surrender of the warrant properly indorsed. When the instrument sued on was executed by Glidden, he duly transferred the nine warrants to the bank for the purpose of pledging the iron as collateral security for the debt so contracted. On the 5th day of November, 1883, the debt having-then becomedue, and beingunpaid, the bank offered the ironforsale at public auction, after having published notice to that effect in some of the newspapers of Pittsburg; and the president of the bank, in its behalf, made a bid of ten dollars per ton for part of the iron, and eleven dollars per ton for the remainder, and all of it was struck off to him at those prices. Thereupon, the cashier of the bank notified the storage company of the purchase, and requested the ownership of the iron to be transferred at once to the president of the bank. That company made the transfer on its books, and thereafter from time to time, rendered its accounts for storage, against the bank,' which were paid by it. No demand of the debt was made of Glidden before the sale, nor was any notice of the sale given him, before or after it occurred; the first information he had with respect to it was when the action below was commenced in 1888. In the meantime, however, he had made no effort to pay his debt, and no inquiry concerning it, or the situation of the iron pledged for its security, for the reason, as he states, that he had become embarrassed. and was unable to pay the debt. At the time of the auction sale, the iron was worth in the *598 market from sixteen to seventeen dollars per ton, and the defendant sought, by way of counterclaim, to compel the bank to account for the market value of the iron, as of that date, upon the ground that the sale constituted a conversion of it. An account upon that basis leaves a balance due Glidden. ■ After that sale the iron remained in store, as it had been before, at the same place, subject to the same charges, and without change in any respect, except the transfer of ownership on the books of the storage company to the president of the bank, and the entry of the storage charges against it, until February 7, 1887, when the bank sold fifteen tons of the iron at $20 per ton, and thereafter, in August and September, 1888, sold the balance for $16 per ton; and an account stated upon the basis of those sales, after deducting storage charges, leaves a balance due the bank. In making these sales, the officers of the bank believing in good faith it had become the owner of the iron at the auction sale, assumed to sell it as the property of the bank, and not under or in execution of the power of sale' contained in the instrument by which it was pledged; but it claims the sales were within the power thus given. ' The case here turns upon the question whether the first sale constituted a conversion.
The right of the pledgee to sell the article pledged, upon the non-performance of the pledg- or’s obligation, is the one characteristic which distinguishes a pledge from a common law lien; and, while the former is always accompanied with an implied power of sale, if none be expressed, it is often declared in the contract of pledge, and the exercise of the power may, of course, be regulated and controlled, and the rights and obligations of the parties with respect to the *599 sale be specifically defined, by the express agreement of the parties. Where the power rests upon implication, the pledge cannot be sold without reasonable notice to the pledgor of the time and place of sale, for the reason that he is entitled to redeem up to the very time of sale, and should be afforded opportunity to be present at the sale to see that it is fairly conducted, and procure bidders, if he should so desire. This requirement of notice may be waived by the pledgor, either in the contract of pledge, or afterward; and by the agreement between the parties in this case, the bank was expressly authorized to sell the property pledged to it by Glidden, without notice. But there was no agreement that the bank might become the purchaser at any sale which should be made, and it is well settled, that in the absence of an express agreement to that effect, a pledgee cannot, directly or indirectly, become a purchaser at his own sale, for the satisfactory reason that he holds the property in a fiduciary capacity, which forbids the disposition of it for his personal benefit, and requires good faith and fidelity to the interests of the pledg-or in making a sale of it. His duty as a seller is inconsistent with his interests as a purchaser; and the principle that a trustee cannot be a purchaser at his own sale is applicable. Story on Bailments, section 319 — Torrey v. Bank, 9 Paige, 649-663; Chouteau v. Allen, 70 Mo., 290, 335.
The purchase for the bank, by its president, at the auction sale of November 5, 1883, was there-’ fore unauthorized, and its subsequent assumption of proprietorship unwarranted, unless ratified in some way by Glidden, which is not claimed; the sale was repudiated by him soon after he became aware of it, and ratification could not be presumed *600 from his silence, for he was ignorant of the sale, and it was manifestly against his interest, having been made at a price much below the market value of the property. If the sale had been ratified, his right would have been to charge the bank with the price at which the property was so sold, and require the application of the proceeds, as of the daté of the sale, toward the satisfaction of his debt and the charges against the property; and in that case, he would have remained liable for the balance due on his debt. And, it appears to be established by the great weight of authority, that such a sale, when repudiated by the pledgor, is not a conversion, where no change has occurred in the actual condition and situation of the property. The relation of the parties remains the same as before the sale, the pledgee continuing to hold under the contract of pledge, leaving the title to the property and rights of the parties unaffected, as though no sale had been attempted. Indeed, in such case, it is said there is no sale for want of a competent purchaser. Bryan v. Baldwin, 52 N. Y., 232; Bank v. Minot, 4 Met. (Mass.), 325; Stokes v. Frazier, 72 Ill., 428; Killian v. Hoffman, 6 Bradw. Ill., 200; Insurance Co. v. Dalyruple, 25 Md., 242; Bank v. Railroad Co., 8 Clark (Iowa), 277; Canfield v. Minneapolis A. & M. Ass’n, 4 McCrary, 646; Duncomb v. R. R. Co., 84 N. Y., 205; Halliday v. Holgate, L. R., 3 Exch., 297; Day v. Holmes, 103 Mass., 307, 311; Donald, v. Sukling, L. R., 12 B., 585.
The rule results from the nature of the contract between the parties. Under a contract of pledge, the right of the pledgee to retain possession of the property continues until the debt or engagement for the security of which it was pledged has been *601 discharged by payment or performance, or a tender, and demand for its return; and his obligation is, to keep the article pledged, with due care, and restore it to the pledgor upon the performance of his agreement. On the other hand, in the absence of any stipulation to the contrary, it is the duty of the debtor to seek the creditor at the proper place and pay the debt, or tender its payment, before he is entitled to receive back the pledge. These obligations of the parties are reciprocal, and neither can require performance by the other without himself being able and ready to perform on his part; so that, the possession of the pledgee being lawful as long as he retains the actual control and custody of the pledge, with the ability to perform his obligation by restoring it, he is not in default, until a demand, accompanied by a tender of the debt is made. If he then refuse or fail to restore the pledge, he may be • charged with its value. The action for its recovery, though treated as one for conversion is, in reality founded on the breach of the contract; and hence, the creditor is entitled to recoup his debt.' Until the breach occurs, no right of action accrues in favor of the pledgor; suffering the debt to run unsatisfied after maturity, does not destroy the pledgee’s lien, or the pledgor’s right to redeem. Wheelan v. Kingsley, 26 Ohio St., 131; Jones on Pledges, sections 543, 566, 571.
The pledgor may, undoubtedly, refuse to recognize a sale made by the pledgee to himself when such a sale is not expressly authorized; but he cannot affirm it in part and .reject it in part; he cannot adopt it so far as to make it effectual to transfer the title to the pledgee, and at the same time reject it as to the price, and terms of the sale; *602 nor, can his rejection, which has the effect of defeating the -pledgee’s title under the sale, at the same time destroy the lien of the latter under the contract of pledge. The sale must be either accepted or rejected as an entirety; and when so rejected, and the pledgee remains in the possession and control of the property, with the ability to perform his contract by restoring it to the pledgor on demand, the contract of pledge continues in force, and the pledgee’s possession, being referable to the contract, is as lawful as before the sale: and, therefore, he can be charged with a conversion of the property only upon his refusal or failure to return it on the performance, or tender of performance of the pledgor’s obligation. The observation sometimes met with in the opinions of judges, and in text books, that the pledgor is at liberty to treat an unauthorized sale of the pledged property as a conversion -by the pledgee, must be taken to refer to such a sale as puts the property bej^ond the control of the pledgee. In cases of that kind the pledgor may charge the pledgee as for a conversion of the property without demand or tender of performance though he is not bound to do so, but may, by subsequent tender and demand, require the pledgee to account for the market value of the property at that time. And of course, it is not the right of the pledgee to insist that his wrongful sale constitutes a conversion, for that would enable him, if he were allowed to do so, to take advantage of his own wrong’, and by his own violation of the contract determine the time, and thus the measure of his liability for its breach. As has already been stated, no offer was made by Glidden, at any time, to pay the debt he owed the bank, nor was any demand made for the return of the iron held in pledge; and, after it *603 was bid off by the president of the bank, on the 5th day of November, 1883, it remained in the control of the bank, as it had been before, without change in any respect, up to the 7th day of February, 1887, when, under the sale that day made, part of the iron passed into other hands; so that, until that time, the bank’s possession was lawful, and it was able to perform its obligation to • Glidden by returning the iron to him, upon payment of his debt. It had, up to that time, exercised no actual dominion or control over the property inconsistent withGlidden’s right to redeem; and the saleof November 5, 1883, being ineffectual to transfer the title, did not, we think, constitute a conversion of the property, which, in legal contemplation was still held under the contract of pledge:
But, by the sale of February 7, 1887, a part of the property pledged, passed beyond the control of the bank, and it was thereafter no longer able to perform its contract with Glidden by making return of the iron to him; and if that sale was unauthorized by the terms of the pledg-e, he might rightfully claim there was then a conversion of the whole of the property, without tender or demand by him. The obligation of the pledgee being to return all of the property pledged, a conversion of part may, at the election of the pledgor, be treated as a conversion, of all, for he is entitled to the return of the very thing pledged, and is not obliged to accept a part of it only. Nor is a tender of payment, and demand for the property necessary where the pledgee has put it out of his power to comply with the demand, and make restoration of the pledge, in order to entitle the pledgor to maintain an action for its wrongful sale. Such tender and demand, when the pledgee has thus incapacitated *604 himself to perforo, his part of the contract, are ex-excused because the act would be a useless ceremony which the law never requires. Cortelyon v. Lansing, 2 Caine’s cases, 200; Alden v. Pearson, 3 Gray, 342, Fletcher v. Dickinson, 7 Allen (Mass.), 23; Wilson v. Little, 2 N. Y., 443.
Whether the sale of February 7, 1887, was made in violation of the agreement between the parties, so as to render the bank liable for the market value of the property at that date, or whether that, and the subsequent sales were made in pursuance of the power conferred by the contract, which, if so made, would limit the bank’s liability to the amount of the net proceeds of those sales, are questions not now before us, and upon which we express no opinion. Issues of fact are joined by the pleadings concerning them, upon which the parties are entitled to have a .trial by jury. In the decision of the question, upon which the judgment below was reversed, the circuit court, we think, committed no error; and its

Judgment is affirmed.